(No. 14060.—Reversed and remanded.)
THE MAUVAISTERRE DRAINAGE AND LEVEE DISTRICT, Appellee, *vs.* THE WABASH RAILWAY COMPANY, Appellant.

*Opinion filed October 22, 1921.*

1. DRAINAGE—*owner of dominant estate has easement for flow of waters over servient estate.* The owner of the dominant heritage has a natural easement over the land of the servient estate for the flow of both surface waters and of water-courses, and the owner of the servient estate cannot, by embankment or other artificial means, interfere with or divert such flow and throw the water back upon the dominant heritage.

2. SAME—*as to rights of dominant and servient owners there is no distinction between surface waters and overflow waters of small streams.* Water overflowing the banks of a small stream in times of flood because of the insufficiency of the natural channel to carry it off is surface water within the meaning of the law, and as to the relative rights of dominant and servient owners there is no distinction between surface waters and overflow waters in times of flood, and the owners of lands along such streams are bound to so use them as not to injure the lands of others.

3. SAME—*construction of levee by servient owner cannot defeat dominant owner's right of drainage in times of flood.* The fact that the owner of the servient estate has constructed a levee does not defeat the right of the owner of the dominant estate to the benefit of the natural drainage over the servient estate in times of flood.

4. SAME—*effect of construction of railroad embankment along a stream.* If the construction of a railroad embankment along a stream causes the stream to overflow in times of flood upon lands across the stream, the owners of said lands may build a levee to prevent such overflow, but if the overflow is a result of the natural slope of the surface, they have no right to build such a levee as will throw more water back onto the right of way than would naturally have flowed there before any change was made.

5. SAME—*when dominant and servient owners acquire reciprocal rights by prescription.* Where the owner of a dominant heritage, with the acquiescence of the servient owner, has diverted water from its natural course and established an artificial channel, through which it has had an unvexed and uninterrupted flow for more than twenty years, mutual and reciprocal rights are acquired by prescription, exempting the dominant owner from restoring the water to its original course and releasing the servient estate from the burden of the easement which once existed.

6. SAME—*when railroad company is required to re-build bridge.* Where the construction of a levee in a levee drainage district will necessitate the reconstruction of a railroad bridge over certain low lands to take care of flood waters the cost must be borne by the district if the natural flow of the surface and overflow waters is in another direction than toward the bridge, but if the natural flow is toward the low lands under the bridge then such cost must be borne by the railroad company.

7. SAME—*drainage district is not required to build steel railroad bridge in place of wooden one.* Although the construction of a proposed levee necessitates the re-building of a railroad bridge because the surface and overflow waters will be diverted to a new channel under the bridge, the drainage district in reconstructing the bridge is not bound to build a new steel bridge in place of the company's wooden pile bridge.

8. EMINENT DOMAIN—*evidence of prices paid by petitioner for other property is not admissible.* Evidence of prices paid or agreed to be paid by a levee drainage district to other property owners for the right of way of a proposed levee is not admissible in a suit for the condemnation of a portion of a railroad right of way.

9. SAME—*witness must be shown to be competent to give opinion of value of property.* There is no presumption that a witness in a condemnation proceeding is competent to give an opinion of the value of the property in question, and it must appear that he has some peculiar means of forming an intelligent and correct judgment as to its value or the effect upon it of a particular improvement beyond what is presumed to be possessed by men generally.

10. SAME—*when opinions as to value of railroad right of way are not competent.* In a proceeding by a drainage district to condemn a portion of a railroad right of way, the opinions of farmers owning land in the vicinity which are based solely on their knowledge of agricultural lands in the vicinity are not competent to show the value of the land condemned even on the theory that such opinions are the best evidence obtainable, where witnesses may be procured who are familiar with the values of railroad rights of way. (*City of Chicago* v. *Farwell,* 286 Ill. 415, distinguished.)

11. SAME—*petitioner has burden of proving value of the property.* The burden of introducing evidence as to the value of property sought to be taken by condemnation rests on the petitioner.

12. SAME—*when motion to dismiss petition as to certain property should be allowed.* In a proceeding to condemn lands for the construction of a levee in a levee drainage district, a motion of a defendant railroad company to dismiss the petition as to its right of way should be allowed where said defendant has been allowed

a separate trial and where the petitioner has introduced no competent evidence as to the value of the right of way sought to be taken.

13. Same—*when instruction as to jury's personal view of premises is misleading.* In a condemnation proceeding, where the only evidence as to the damages to land not taken is given by the defendant's witnesses, an instruction is misleading which, in effect, authorizes the jury to disregard such evidence and rely upon the jury's personal view of the premises.

Appeal from the County Court of Scott county; the Hon. Thomas Henshaw, Judge, presiding.

Bellatti, Bellatti & Moriarty, for appellant.

J. M. Riggs, for appellee.

Mr. Justice Carter delivered the opinion of the court:

This was a proceeding brought under the Eminent Domain act by the Mauvaisterre Drainage and Levee District, in Scott county, to condemn in the county court of that county a right of way for a levee, known here as the Wolf Run levee, across the Wabash Railway Company's right of way and other lands. After several motions were filed and various orders entered, an amended petition was filed by appellee and a cross-petition by appellant, the latter asking for the assessment of damages to its property contiguous to that proposed to be taken. After the pleadings were settled and a motion had been allowed giving appellant a separate trial, a jury was empaneled to find the just compensation to be paid appellant for the property taken and to assess the damages to its property not taken. The jury returned a verdict finding the market value of the property sought to be taken to be $100 and the damages to the right of way of appellant's main line not taken to be $2000 and to the right of way of its so-called Keokuk line not taken to be $2500. A judgment was entered on this verdict, after motion for new trial was made and overruled. An appeal was then perfected to this court.

The appellee drainage district, organized under the so-called Levee act for the protection of lands from the overflow waters of Mauvaisterre creek, had been in existence for some years. The amended petition was filed to protect the lands near Wolf run, which is a stream not far from Mauvaisterre creek, from overflowing lands north of said creek in the vicinity of said run. The evidence shows that Wolf run rises in the high lands to the east and southeast of the village of Bluffs, in Scott county; that it drains approximately nine square miles of territory; that it receives the waters of several branches as it comes down from the higher lands east of Bluffs, and that it also receives the waters of a creek known as Merris branch, which empties into Wolf run near the western corporate limits of Bluffs. The current of Wolf run as it comes down from the high lands east of Bluffs, where it crosses back and forth under the Wabash tracks several times, is quite rapid. A short distance east of Bluffs the ground flattens out somewhat, although the stream still runs quite rapidly through the village about 600 feet south of the Wabash tracks. It then meanders in a northwesterly direction until a short distance from the west corporation line of Bluffs, where it runs up to and along the side of the right of way of the main line of the Wabash and at about the same point receives the waters of Merris branch. The evidence shows that at that point the Wabash tracks run slightly north of west. Wolf run flows along the side of the right of way south of the Wabash tracks for about 1000 feet, when it makes a rather abrupt turn to the north and flows across the Wabash right of way under a bridge known in the case as bridge 500. The evidence further shows that just before reaching bridge 500 the Wabash railroad divides into two branches, one running west to the village of Naples and then continuing to Hannibal, Missouri, and the other taking a northwesterly course for about a mile, thence turning north and going to Meredosia and thence northwesterly to Keokuk,

Iowa.   The line running to Hannibal is known as the main line, the other line being commonly called the Keokuk branch.   The evidence also shows that Wolf run, after crossing the main line under bridge 500, has flowed for years in a northwesterly direction immediately adjoining on the west the right of way of the Keokuk branch for a distance of 4000 feet, for all of which distance the fall of the stream continues to diminish, and at about 4000 feet it makes another abrupt turn to the north, or slightly northeast, across the right of way of the Keokuk branch, under a bridge that is called in the record 277-A; that it then flows northerly and northeasterly, passing through territory formerly known as Dickerson lake, and having a very gradual fall for about a mile and a half into a cut ditch called sometimes in the record Dresser ditch and sometimes Coon Run ditch and thence west along this ditch, crossing the Keokuk branch once more, to the Illinois river.   The evidence tends to show that Dickerson lake is a shallow body of water, into which several streams, including Wolf run, ran in the natural condition of the country.   It had no outlet to the west, towards the Illinois river, but had an outlet for overflow to the south and southwest across the present right of way of the Keokuk branch, where the overflow finally went into what is called in the record Bug Island lake, which seems to be low, swampy territory and not a lake in the real sense of the term except in high water, and thence south and westerly into the Mauvaisterre creek and through that into the Illinois river.   The evidence also tends to show that from a point near the junction of the Merris branch with Wolf run some of the owners of the lands in that vicinity had constructed a private levee along the southwesterly side of Wolf run down to the Wabash main right of way west of bridge 500, the top of the levee being about level with the top of the railroad embankment on the opposite side of the stream.   The evidence tends to show that northwest of bridge 500 a levee had also

been thrown up on the southwesterly side of Wolf run, extending from a point a few hundred feet northwest of said bridge to a public highway known as Naples highway, which ran west across the Keokuk branch just northwest of bridge 277-A; that this private levee was, on an average, about the same height as the railroad embankment on the opposite side of the stream. There is some evidence also to the effect that said levee and the railroad embankment were at about the same height above the natural surface of the ground and at some points as much as four or five feet above, and that at times of heavy rains in the watershed area of Wolf run great quantities of water came down said stream in a short time, and usually or frequently overflowed the lands and sometimes the levee and the embankment of the railway, and as speedily subsided.

The evidence shows that the village of Bluffs is situated in the northwest corner of a certain section 15; that before there was any village of Bluffs the railroad was built across section 15, and at the time of the earliest recollection of the oldest witness testifying, the railroad tracks on both the Hannibal and Keokuk lines were in practically the same location as at present; that Wolf run has come during all these years from the east in practically the same channel as at present down to where Merris branch empties into it, and that then it came up near to the Wabash railroad and ran on the south side of the Wabash tracks; that at that time there was no levee on the south or southwest side, and that all or part of the waters of Wolf run kept south of the Hannibal line and spread out over the bottoms, where the surface water gradually emptied into what is called Cassidy lake, and finally into Bug Island lake; that the Keokuk line, as originally constructed to the northwest, ran across to the southern end of the so-called Dickerson lake on an embankment across said lake, except that near the middle of the lake there was a 50-foot bridge constructed, known as bridge 278; that the overflow water

from Dickerson lake before the so-called Dresser or Coon
Run ditch was cut through the sandbank in the northern
part of the lake would go under bridge 278, thence south-
west through the long low swale known as Bug Island lake
and thence to Mauvaisterre creek, the swale passing under
the main line of the Wabash at a bridge known as 501,
which is still in existence, at a point about 666 feet west
of bridge 500.  The evidence shows that about 1883 some
persons, either under the auspices of a sort of drainage dis-
trict or by voluntary combination, cut a ditch through the
sand ridge on the west of Dickerson lake towards the north
end, so that afterwards the waters of Dickerson lake had
an outlet at its northern end, and that thereafter a part of
the waters of Wolf run flowed with the waters of Dicker-
son lake north and west through this ditch into the Illinois
river, but the overflow waters still continued to some ex-
tent to flow under bridge 278 from Dickerson lake to the
west and southwest and down through Bug Island lake and
under bridge 501 to Mauvaisterre creek.  There is some evi-
dence in the record tending to show that about 1886 the
owners of the land where Wolf run flows northwest of
bridge 500 began to throw up a small levee on the west
side of the stream, and that thereby the bed of the stream
was continued to be pushed over until it ran in almost a
straight course along and opposite the right of way of the
Keokuk branch; that this straightening of the bed of the
stream along the right of way was partly caused by a ditch
being dug for that purpose and partly by the levee so built.
The evidence also tends to show that about 1888 a section
foreman of the Wabash railway (Steplin) was seen by cer-
tain farmers with reference to taking out a cattle-guard
which existed near the present site of bridge 277-A and
putting a bridge there.  After a conference with his supe-
riors in the fall of that year a bridge crew of the railway
company was sent to that place and bridge 277-A was built.
It is a pile bridge about 60 feet long and set on four or

299—20

five rows of piling. The piles constituting the support for
the two center spans are approximately 18 feet apart. At
that time no water ran across the track at that point. The
evidence tends to show that the following year, 1889, cer-
tain of the land owners proceeded to dig out the dirt around
and between the piling and connected the ditch so dug with
Wolf run and by means of a small levee on the west bank
turned the normal flow of water under said bridge, and it
is argued by counsel for appellant that neither the railroad
officials nor their employees had anything to do with the
construction of this ditch or levee; that since the building
of bridge 277-A the overflow waters of Wolf run have con-
tinued to flow over or break the levee on the west side and
have continued to take their old course across to the low
swale and down to Bug Island lake; that these floods oc-
curred every year,—sometimes more than once a year,—
and that because of these overflows the levee was raised,
apparently by the owners of the adjoining lands; that twice
the railroad embankment was raised in order that it might
be maintained at least as high as the levee, and that on one
or two occasions bridge 277-A was raised and the piles re-
driven; that these changes increased the channel capacity
under the bridge and the capacity of the bridge was never
decreased from that time. The evidence also tends to show
that since the digging of the Dresser or Coon Run ditch
at the north end of Dickerson lake the waters of said lake
have so drained away that there is not now any substantial
body of water left there and many feet of silt have been
deposited where the lake was.

The record shows that the proposed work of the peti-
tioner, so far as Wolf run is concerned, consists principally
in the construction of a levee on the west bank of Wolf
run from a point below bridge 277-A and extending up-
stream to its junction with Merris branch and then a short
distance up the west bank of Merris branch; that incidental
to the construction of the levee it is proposed to clean out

the channel of Wolf run so that it will have a uniform bottom width of 20 feet; that in constructing the levee it will be necessary to use a small portion of the Wabash right of way, containing about twenty-one hundredths of an acre; that the building of the levee will not permanently deprive the railroad company of its right of way but the taking will be for the purpose of an easement for the construction of the levee. The evidence tends to show that the construction of this levee on the west bank of Wolf run will confine the waters of Wolf run to the east of the levee, so that at high water the railroad right of way on the Keokuk line, as well as for a short distance on the main line, will be overflowed, and if the levee is so constructed it will render necessary the raising of the right of way where thus made liable to overflow, both on the main and Keokuk lines, as high as the levee.

One of the chief questions in dispute in the briefs is whether the expense of raising the right of way embankments of the railway company should be borne by the appellee district or by the railway company itself, and the decision of this question rests largely upon whether the right of way of the railway company is the dominant or servient heritage, as those terms are used concerning water flowing in a natural stream or the overflow waters of the same, as compared with the land where the levee is proposed to be constructed. It is contended by counsel for appellant that the evidence in the record shows clearly that the natural surface of the land upon which appellant's right of way is located at this point is the dominant heritage, while counsel for appellee insists that the overflow waters of Wolf run would naturally flow over the land upon which the railroad embankments were originally located.

The owner of the dominant heritage has a natural easement over the land of the servient estate both for the flow of the surface waters and of water-courses, and the owner of the servient estate cannot interfere with or divert such

flow.   Water overflowing the banks of a small stream in
times of flood because of the insufficiency of the natural
channel to carry it off is surface water within the meaning
of the law, relieving the natural drainage.   In Illinois there
is no distinction, as to small streams, between surface waters
and overflow waters in times of flood, and the owners of
lands along such streams are bound to so use them as not
to injure the lands of others, both as regards surface and
overflow waters.   The owner of a servient heritage has no
right, by embankment or any other artificial means, to stop
the natural flow of surface water from such servient heri-
tage and thus throw it back upon the dominant heritage.
The fact that the owner of the servient estate has con-
structed a levee does not defeat the right of the dominant
estate to the benefit of the natural drainage over the servient
estate in times of flood.   In Illinois, so far as the relative
rights of dominant and servient owners are concerned, there
is no difference between water-courses, as the term is un-
derstood at common law, and surface water which flows in
a regular channel at certain times, only.   (*Gormley* v. *San-
ford,* 52 Ill. 158; *Pinkstaff* v. *Steffy,* 216 id. 406; *Chicago,
Peoria and St. Louis Railway Co.* v. *Reuter,* 223 id. 387;
*Broadwell Drainage District* v. *Lawrence,* 231 id. 86.)   If
by the construction of the railroad right of way an embank-
ment or levee was formed which threw more of the water of
Wolf run than flowed naturally into it or overflowed from
it onto the lands to the south and west of either the Keo-
kuk branch or the main line of the Wabash railway, the
owners of the lands to the south and west would have a
right to build levees to prevent this additional flow from
running over their lands; but in the natural condition of
the surface of the ground the owners of the lands to the
south and west would have no right to build such a levee
as would throw more water back onto appellant's right of
way than would naturally have flowed there before there
was any change in the natural condition.

Counsel for appellant have argued in this connection that the railway company built its embankment along Wolf run far enough from the bank of that stream to leave a sufficient waterway both for the natural waters of the stream and the overflow surface waters and that afterwards the stream was crowded up against the railway company's right of way, thus causing a congested condition; that the railway company had built and maintained its embankment free from overflow waters for many years before there was any levee on the other side and had since then always maintained its embankment high enough to keep the other side in servitude, and that therefore no levee could legally be built on the other side which would not provide a sufficient channel to leave the railroad embankment undamaged by the water. Under the rule of the civil law, which has been adopted in this State, the right of drainage is governed by the law of nature, and the lower proprietor cannot do anything to obstruct the natural flow of surface water and cast it back upon the land above; and there is no distinction between surface water and that flowing in a natural watercourse. (*Bradbury* v. *Vandalia Drainage District,* 236 Ill. 36.) But when the owners of the dominant heritage, with the acquiescence of the servient owners, have diverted the water from its natural course and established an artificial channel, through which water has had an unvexed and uninterrupted flow for more than twenty years, mutual and reciprocal rights have been acquired by prescription, exempting the dominant owner from the duty of restoring the water to its original course and forever releasing the servient estate from the burden of the easement which once existed in favor of the dominant estate. (*Broadwell Drainage District* v. *Lawrence, supra;* see, also, *Wills* v. *Babb,* 222 Ill. 95.) The evidence in the record is not entirely in harmony as to whether or not in a state of nature the building of the embankment upon which the appellant's tracks are constructed threw more water, either from the

bed of Wolf run or from overflow, to the south and west than would naturally flow in that direction. Neither is it in entire harmony as to whether or not the present condition caused by the construction of the Keokuk branch and the building of a bridge there changed the natural flow of such surface or overflow waters to the damage of the owners of the agricultural lands to the south and west. As this case must be reversed for other reasons and questions of fact will have to be re-tried by a jury and the trial court, we do not think it is necessary that we pass upon that question in this opinion. What is here said will serve as a sufficient guide to the trial court in the further hearing of this case on this question.

The railway company has for years maintained two bridges, known in the record as 500 and 277-A. They are wooden bridges supported by piling driven in the bed of Wolf run. It is conceded by counsel for both parties that these bridges will have to be changed and re-built if the proposed improvement is constructed. In the trial below the defendant company was permitted to try the case on the theory that all changes made necessary in these two bridges and the road on both branches by appellee's improvement should be paid for by appellee, while counsel for appellee contended below, and argues here, that the railway company should be required to replace the said bridge with clear-span bridges at its own expense. Counsel for appellant contend that the trial court's ruling as to who should re-build the two bridges was correct. The evidence seems to show that the outlet below bridge 277-A was very poor; that the ground was quite flat and that two levees (one by the railroad above this bridge) had been built on each side of the stream only a short distance apart, giving very little area between the levees, and that the work proposed by the district did not comprise any improvement whatever down the stream from bridge 277-A. Counsel for appellant also contend that on the evidence offered on the trial, even if

the piling be removed below bridges 500 and 277-A and a new span constructed without any piling across the stream, as it is assumed that the main body of water would run in said channel or stream, the proposed channel would not have sufficient capacity to take care of the waters that might reasonably be expected to flow into said stream, even if the waters had a free and unobstructed channel in the stream for all the distance between bridge 500 and bridge 277-A.

If there were no controversy in the record as to the facts with reference to the original outlet for Wolf run and the direction of its overflow or surface waters there would be no particular difficulty, under the decisions already rendered by this court, in deciding whether the cost of the new bridges where bridges 500 and 277-A are now located should be paid for by the appellee district or by the appellant company, for if the ordinary waters of Wolf run, together with the overflow or surface waters that would naturally drain into it, had always had their outlet through Dickerson lake and to the west, where the cut ditch was located from the northwest portion of Dickerson lake into the Illinois river, and none of the overflow or flood waters of Wolf run ran in a southerly or southwesterly direction across the lands, finally reaching Mauvaisterre creek, then, under the decisions of this court in *Chicago, Burlington and Quincy Railway Co.* v. *People,* 212 Ill. 103, and *Cache River Drainage District* v. *Chicago and Eastern Illinois Railroad Co.* 264 id. 97, as construed by this court in *Sanitary District* v. *Chicago and Alton Railroad Co.* 267 Ill. 252, *East Side Levee District* v. *East St. Louis and Carondelet Railway,* 279 id. 123, *East Side Levee District* v. *East St. Louis, Columbia and Waterloo Railway Co.* 279 id. 362, *East Side Levee District* v. *St. Louis, Iron Mountain and Southern Railroad Co.* 280 id. 222, and *Indian Creek Drainage District* v. *Chicago, Burlington and Quincy Railroad Co.* 295 id. 339, there could be no doubt that the theory upon which the court ruled, that appellee should be

compelled to pay for the cost of reconstructing the two bridges, 500 and 277-A, was erroneous; but, as already stated, counsel for appellant earnestly insist that the weight of the evidence shows that the outlet of Wolf run, even for its ordinary flow of waters, and particularly for its overflow waters, was not ordinarily or naturally through Dickerson lake to the northwest and along the line of the cut ditch into the Illinois river, and that ordinarily there was no outlet in that direction but that the waters that ran from Wolf run into Dickerson lake in a state of nature flowed to the south and west into Bug Island lake, not only the ordinary waters but the overflow waters that escaped in any direction from Dickerson lake; that the weight of the evidence tends to show that much of the overflow waters after the construction of the railroad embankments and the construction of the levees escaped to the south and west over the low lands into Bug Island lake before they reached or flowed into Dickerson lake. As already stated, the evidence in the record does not conclusively settle this controverted question. There can be no doubt that the waters from Dickerson lake did not run, before the construction of the Dresser or Coon Run ditch, from the north end of Dickerson lake westerly into the Illinois river, but the evidence shows, without contradiction, that before the construction of this ditch the overflow waters reaching Dickerson lake from Wolf run or from other sources flowed to the south and west into Bug Island lake. The question necessary to decide in reaching a conclusion on this point is whether the overflow waters of Wolf run would naturally reach Dickerson lake or would flow to the south and west if the proposed levee was not constructed across the agricultural lands, until they reached Bug Island lake and thence on to Mauvaisterre creek and the Illinois river.

If on the re-trial of this case the weight of the evidence shows that such overflow waters from Wolf run, without the construction of the proposed levee and uninfluenced

by the embankment on the railway right of way, would flow south and west across these agricultural lands instead of under bridge 277-A, into Dickerson lake, then, beyond question, if bridge 277-A must be re-built on account of the construction of the proposed levee the cost of reconstructing said bridge would have to be borne by the appellee district. While the evidence in the record does not as strongly indicate that the overflow waters of Wolf run, without the construction of the proposed levee, would require the reconstruction of bridge 500 the same as the reconstruction of bridge 277-A, the same rule of law would apply to the reconstruction of both bridges, depending particularly upon the special facts with reference to the natural flow of overflow or flood waters of the stream at the respective locations of the two bridges. If, however, on the re-trial of the case the weight of the evidence does not show that the overflow or flood waters of Wolf run would all find their outlet, if the proposed levee were not constructed, to the south and west across the agricultural lands, but would naturally run in the channel of Wolf run north and west under bridge 277-A, if properly constructed, into Dickerson lake, then the cost of reconstructing bridge 277-A so as to take care of the overflow or flood waters that would naturally flow into Dickerson lake must be borne by the appellant railway company.

It is argued by counsel for appellee,—and the evidence tends to support his argument,—that the case was tried in the trial court on the theory that the appellee district will be compelled, on the showing made on this record, to replace bridges 277-A and 500 with new steel bridges sufficient to care for the overflow or flood waters of Wolf run after the construction of the levee. On no theory do we think the law would require the construction of new steel bridges in the place of the present wooden pile bridges. Even if all the overflow or flood waters of Wolf run would flow to the south and west across the agricultural lands if

not prevented by the proposed construction of the levee and by said construction would flow under said bridges into Dickerson lake, the appellee district should not be required, under the reasoning of the authorities already cited, to construct new steel bridges in place of the wooden bridges now in existence. It would only be required to reconstruct the bridges of as good material and be as useful and lasting for the purposes for which they have been constructed as the bridges in place at those two points now are. The appellee district would surely not be required to construct much better bridges, of much more lasting qualities, than are now in use at those points. We think what we have said, in the light of the decisions already rendered, will make it reasonably clear what the rulings of the trial court should be on these points when the case is re-tried. There should be no difficulty, in view of the repeated decisions of this court, in laying down the correct rules of law on the re-trial of this case.

Evidence was offered on the part of the appellee district, and admitted over objection by the trial court, as to the price at which certain lands in the vicinity had been sold to appellee for right of way purposes. Under the well settled rules and decisions of this court, evidence of prices paid or agreed to be paid by petitioner to other property owners for right of way is incompetent and inadmissible. (*Peoria Gas Light Co.* v. *Peoria Terminal Railway Co.* 146 Ill. 372; *Lyon* v. *Hammond and Blue Island Railroad Co.* 167 id. 527; *South Park Comrs.* v. *Ayer*, 237 id. 211.) This is the general rule in other jurisdictions. (*Curley* v. *Jersey City*, 43 L. R. A. (N. S.) 985, and note.) This evidence was improperly admitted.

Six witnesses were called to testify on behalf of appellee to the value of the small piece of appellant's land taken for the levee by appellee. Their estimates ranged from $200 to $300 per acre. They were all farmers except one, who was the engineer of the district, and no one

of them claimed to have knowledge of values of land for railroad purposes. One of the six witnesses gave no information as to the values. One witness stated that a piece of land—a part of the district—sold for $250 an acre. When these witnesses testified their testimony was objected to on the part of appellant on the ground that they were not qualified to testify as to the value of its right of way, and the objection was overruled. At the close of the evidence for appellee a motion was made to dismiss the petition because there was no competent evidence introduced by appellee as to the value of the property of appellant proposed to be taken, and this motion was overruled. While the question of the competency of witnesses is left largely to the discretion of the trial judge, there is no presumption that a witness is competent to give an opinion, and his competency must be shown. It must appear that he has some peculiar means of forming an intelligent and correct judgment as to the value of the property in question, or the effect upon it of a particular improvement, beyond what is presumed to be possessed by men generally. (2 Lewis on Eminent Domain,—3d ed.—sec. 656.) To entitle a witness to testify to the value of a thing which is of such a nature as to have a current or market value he must be acquainted with the value of things of the class to which the thing whose value is in question belongs. (*Berg* v. *Spink*, 24 Minn. 138; *Clark* v. *Rockland Water Co.* 52 Me. 68.) "When a party has stated his knowledge of the value of the class of property about which he is testifying he may usually be asked his opinion, but not otherwise." (*Cooper* v. *Randall*, 59 Ill. 317; see, also, *Forest Preserve District* v. *Carahcr*, ante, p. 11; 1 Wigmore on Evidence, secs. 653, 713, 717; *Benton* v. *Brookline*, 151 Mass. 250.) Where the use of a strip of land across a railroad company's right of way and depot grounds is condemned for a public street, the measure of damages for the property taken is the decrease in value for its use for

railroad purposes caused by its being used as a street. (*Chi-, cago, Burlington and·Quincy Railroad Co.* v. *City of Naperville,* 166 Ill. 87; see, also, *City of Lincoln* v. *Chicago and Alton Railroad Co.* 262 Ill. 11, and authorities cited.) Tested by the standard laid down by these authorities, there was no competent evidence introduced or offered by appellee of the value of the property proposed to be taken.

Counsel for appellee, in effect, seems to concede that the witnesses offered did not qualify strictly within the rules laid down, but argues that the evidence was properly admitted because it was the best evidence that could be offered in support of the issue submitted, and that under the reasoning of this court in *City of Chicago* v. *Farwell,* 286 Ill. 415, that is all the law requires. Opinion evidence which excludes as a basis for the opinion any consideration of the particular purpose for which the property is actually to be used cannot be the best evidence, and the reasoning of this court in *City of Chicago* v. *Farwell, supra,* is not to that effect. The court was there referring to the value of such property if used for the purpose of a church, college, cemetery, club house or railroad terminal, and stated that such property might not have a market value, and that then evidence of various matters showing its substantial value could be received in lieu of evidence of market value. The court did not say that because such peculiar property had a value far in excess of the market value of surrounding property, evidence of the value of such surrounding property should be received. There can be no question that witnesses could have been obtained who were familiar with the values of railroad rights of way and other railroad property, who could have testified as to the value of the easement to be taken from the railroad property by the proposed condemnation. All the farmers who testified plainly did so from their knowledge of the value of agricultural lands, and the engineer of the drainage district stated that he never had any experience in valuing railroad rights of

way. We have no question that the evidence was improperly admitted. The burden of introducing evidence as to the value of property sought to be taken rests on the petitioner. *McReynolds* v. *Burlington and Ohio River Railway Co.* 106 Ill. 152; *South Park Comrs.* v. *Trustees of Schools,* 107 id. 489; *Chicago, Burlington and Quincy Railroad Co.* v. *Reisch & Bros.* 247 id. 350.

As no competent evidence was found in the record as to the value of the land sought to be taken, the motion of appellant, at the close of the petitioner's case, to dismiss the petition as to appellant should have been allowed. It is true, the petition involved certain other property sought to be condemned, but appellant was allowed a separate trial, and the motion, if allowed, would have dismissed the petition only as to appellant's property, and would not in any way have affected the property rights of the petitioner or any other parties to the proceeding.

Counsel for appellant insist that several instructions given on behalf of appellee were misleading and erroneous, among others instructions 8 and 9, because they inferred that certain witnesses (necessarily those on behalf of appellant) had magnified or exaggerated the damages to land not taken and the jury might disregard such evidence and give such damages as they thought proper, and in reaching this conclusion they might take into consideration the entire testimony, including their own inspection of the premises. It is insisted that these instructions are wrong, first, because there is no evidence in the record justifying the court or jury in concluding that any of the witnesses had exaggerated the damages to the land not taken. We are of the opinion that the instructions are subject to the charge of being misleading in this regard. It is also insisted that they were erroneous because they justified the jury in thinking that they had a right to disregard the evidence on behalf of appellant in the record and base their verdict on their view of the premises, since there was no evidence in-

troduced by appellee on this point; that practically the only testimony given on this question was presented by witnesses for appellant; that its witnesses on this question testified that the damages to the main or Hannibal line would be from $12,000 to $17,000 and to the Keokuk line from $25,700 to $26,600, and that as the jury returned a verdict of $2000 damages to the main line and $2500 to the Keokuk line they could not have obtained this result from the evidence offered, as it was not anywhere within the range of the testimony actually introduced, but must have based it on their own view of the premises. "To allow jurors to make up their verdict on their individual knowledge of disputed facts material to the case, not testified to in court, or upon their private opinions, would be most dangerous and unjust. It would deprive the losing party of the right of cross-examination and the benefit of all the tests of credibility which the law affords. Besides, the evidence of such knowledge or of the grounds of such opinions could not be preserved in a bill of exceptions or questioned on appeal. It would make each juror the absolute judge of the accuracy and value of his own knowledge or opinions." (*Washburn* v. *Milwaukee and L. W. Railroad Co.* 59 Wis. 364.) While the personal view of the premises by the jury in a condemnation case is in the nature of evidence, yet the jury may not ignore all the evidence and fix the compensation and damages directly contrary thereto, and only where the evidence is conflicting may the jury draw their own conclusions from a personal view. "The verdict must be supported by the evidence and can in no case rest solely upon the personal examination of the premises by the jury, however well convinced they may be that their examination furnishes a more reliable basis for an assessment of damages than the testimony of the witnesses." (*Peoria Gas Light Co.* v. *Peoria Terminal Railway Co. supra,* p. 383, and cases there cited; *Chicago City Railway Co.* v. *Allen,* 169 Ill. 287; *Chicago and State Line Railway Co.* v. *Kline,*

220 id. 334.)   These instructions were subject to criticism and should not have been given in this case.

Appellant also objects that instructions 11 and 12 for the petitioner are also subject to the criticism that they might be interpreted by the jury as authorizing them to go outside the evidence and base their verdict on their view of the premises.   These instructions are fairly subject to this criticism and should not have been given.

It is also objected that instruction 15 for the petitioner should not have been given, because it purported to state the law in regard to Wolf run being a natural water-course and ignored appellant's defense of its rights as to the railroad right of way being obtained by prescription as to the water of said stream or the overflow waters of the same, for that instruction stated, among other things, that the fact that "such changes are more than twenty years old and have been acquiesced in by the public and all concerned for more than twenty years will not change the character of such stream as a natural water-way."   As already stated, we think the authorities hold that the rights and obligations with reference to overflow water or the water from the bed of a stream may be changed by usage for twenty years, acquiesced in by the parties interested, and therefore this instruction was misleading and should not have been given.

Instructions 16 and 17 given for petitioner are also somewhat misleading, the same as instruction 15, on the point of Wolf run being a natural water-course.

Objections are made to the refusing of other instructions which involve points somewhat similar to some already considered and passed on in this opinion.   What we have said sufficiently covers those points without further reference in detail to the refused instructions.

The judgment of the county court is reversed and the cause remanded for further proceedings in harmony with what is stated herein.   *Reversed and remanded.*