(No. 20643.—

THE ILLINOIS LIGHT AND POWER COMPANY, Appellant, *vs.* CECILE BEDARD *et al.* Appellees.

*Opinion filed April 23, 1931.*

John H. Beckers, E. A. Marcotte, and Townley, Wild, Campbell & Clark, (Morris Townley, of counsel,) for appellant.

E. J. Lamarre, and Miller & Shapiro, for appellees.

Mr. Justice Orr delivered the opinion of the court:

The Illinois Light and Power Company, appellant, on June 8, 1928, filed its petition in the county court of Kankakee county for the condemnation of 70 acres of land owned by Cecile Bedard. On the trial before a jury to determine the amount of damages there was a verdict fixing the compensation to be paid for the property at $35,000. Judgment was rendered on the verdict, from which the petitioner has taken this appeal.

The errors assigned and argued by appellant are, that the trial court admitted incompetent testimony, that one instruction given to the jury was erroneous, and that the judgment was excessive.

The land was sought to be condemned for a hydro-electric power project and is located along the east bank of the Kankakee river, within 1200 feet of the city limits of Kankakee. It is part of a 150-acre tract, consisting largely of rolling pasture land, partly wooded, which gently slopes from the east toward the river. Prior to the filing of the petition for condemnation in 1928 a petition was circulated and signed by 2000 citizens of Kankakee requesting the park district of that city to acquire sufficient land for a municipal golf course. The Bedard land was then under consideration, as it was claimed by those interested that no other land so well adapted for park and golf purposes could be secured in such close proximity to the city. The Bedard land had been surveyed and its desirability for use as a golf course had been recognized and considered, both as a municipal and as a daily fee course, prior to June 8, 1928, but up to that time it had been used only for agricultural purposes.

There was a wide divergence in the evidence of land values testified to by the various witnesses, as is not unusual in condemnation proceedings. Of the eleven witnesses who testified for appellant there were six farmers, two real estate men, one retired land owner, one golf professional and one golf architect. The farmers all testified to an average value of about $100 per acre for the 70-acre tract, and designated pasturage and farming as its best use. The real estate men placed values of from $125 to $400 per acre on different parts of the tract, suggesting the use of the strip along the river for summer cottages and the remainder for truck farming. Neither the golf professional nor architect, who both testified in rebuttal, ventured any opinion as to the value of the land itself but confined their testimony chiefly

to costs of building and operating golf courses. For the appellees nine witnesses testified, consisting of the president of the Kankakee Park District, four real estate men, two lawyers, one undertaker and one golf architect. Their testimony of values ranged from $800 to $1500 per acre, and indicated a golf course or real estate subdivision as the best and highest use for which the land was adapted. Several witnesses believed it would be best to subdivide the whole tract, while others testified that its best use was a partial subdivision in connection with a golf course. The wide disparity of values fixed upon the land by the different sets of witnesses was undoubtedly due to the fact that witnesses for appellant, with one or two exceptions, gave the land a market value for farming purposes, only, while the witnesses for appellees all considered the best use to which the land could be put was for the establishment of a golf course and for subdivision into lots.

The undisputed rule is that the "market value" of property, as applied to condemnation proceedings, is its value on the market for the highest and best use to which it can be put. (*Illinois Power and Light Corp.* v. *Parks,* 322 Ill. 313; *Crystal Lake Park District* v. *Consumers Co.* 313 id. 395; *Southwest Chicago Drainage District* v. *Mc-Mahon,* 329 id. 478.) Market value means the value of the land for the most profitable use to which it is adapted. (*Kankakee Park District* v. *Heidenreich,* 328 Ill. 198.) There are certain exceptions to this rule where the market value cannot be the legal standard of compensation because the property is of such a nature and applied to such a special use that it cannot have a market value, as, for example, a church, college, cemetery, club house or railroad terminal. (*City of Chicago* v. *Farwell,* 286 Ill. 415.) But the case at bar does not fall within any of these exceptions.

It is urged that the court erred in permitting witness Moreau, a golf architect and landscape engineer, to testify that in his opinion the tract in question was best adapted

for use as a daily fee golf course. The chief objection to Moreau's testimony was that it was speculative, and that the adaptability of land for a particular use is immaterial unless its present market value is enhanced by reason thereof. We shall review the evidence on this point first and then consider the cases cited in its support. If Moreau's testimony was speculative then all the witnesses who testified on both sides, except the farmers, also indulged in speculation. It is significant that from three different witnesses who testified, one for appellant and two for appellees, there came testimony that prior to June 8, 1928, the Bedard land had been sought for a golf course. Prior to the institution of these condemnation proceedings 2000 of the 21,000 citizens of Kankakee had petitioned the park district to acquire sufficient land for a municipal golf course. R. G. Drolet, president of the park district and former banker of Kankakee, testified for appellees that the Bedard tract was not within the Kankakee Park District and therefore the district could not condemn it, but that the members of the park district board had talked to Bedard about purchasing this land. Drolet considered its highest and best use to be for a park and municipal golf course, and considered its value for such purposes to be $1500 per acre. One of the witnesses for appellant, Harry L. Topping, a real estate and insurance agent, admitted on re-direct examination that he had made an effort to promote the sale of the Bedard property for golf purposes in the spring of 1928 and had gone so far as to hire and pay a surveyor $35 to survey the property for that purpose. Another witness for appellees, Louis Ray, a real estate man, testified that in 1928 he had worked on the project of a golf course on the Bedard land with some of his associates; that "they were about ready to go, but on account of the chamber of commerce wanting the park commission to start a municipal course they laid low." Thus it will be seen that the building of a golf course on the Bedard land was not something which was conjured up

after the petition for condemnation was filed but it was a matter which had been in the minds of various citizens of Kankakee before that time. It was shown that there was a private country and golf club in Kankakee, but the nearest public or daily fee golf course was shown to be the Hieland club, about seven miles from Kankakee, reached by driving three and a half miles on a dirt road. In our judgment it was not speculation for the witness Moreau to testify that the highest and best use to which the Bedard land could be put was a daily fee golf course. The evidence showed that the property in question was not only easily accessible and favorably situated near the city limits of Kankakee, but its topography made it easily adaptable for use as a golf course. Its location along the bank of the Kankakee river made it unusually attractive for park and subdivision purposes. The 70-acre tract extended along the Kankakee river for 3036 feet. It is a matter of common knowledge that in every city located on a river or other body of water the land near or abutting such body of water generally has a higher market value for business or residential purposes than similar land situated farther away. Even aside from the testimony of witness Moreau, the evidence here shows that the Bedard land is adaptable for use as a golf course. The golf architect, McElhatten, who testified for appellant on rebuttal, admitted on cross-examination that this land was suitable for golf, although he insisted that it would be too expensive to operate a daily fee course there successfully.

A consideration of some of the cases cited by appellant in support of its contention that the evidence concerning the golf course was speculative will show their inapplicability to the facts here presented. Thus, where the land involved was already being put to its best use and therefore could not be enhanced any further, (*Chicago, Burlington and Quincy Railroad Co.* v. *City of Chicago,* 149 Ill. 457,) or where a future use alone, not coupled with a present use, (*Chicago and Alton Railway Co.* v. *Staley,* 221 Ill. 405,)

or an imaginary use not considered before the proceedings were begun, (*Chicago, Burlington and Quincy Railroad Co.* v. *Reisch & Bros.* 247 Ill. 350,) or the contingencies of future profits from the operation of a saloon or other business, (*Jacksonville and Southeastern Railway Co.* v. *Walsh,* 106 Ill. 253,) were considered, this court has held that testimony of such uses was too speculative and remote to be considered. These and other cases cited are easily distinguishable from the present situation, where the use of the Bedard land for a golf course is shown not only to be feasible but also to have been seriously considered by different citizens of Kankakee before the condemnation petition was filed. Another case cited by appellant against the use of speculative testimony was *Mauvaisterre Drainage District* v. *Wabash Railway Co.* 299 Ill. 299. But our decision in that case, as applied to the facts in the case at bar, fully justifies the action of the trial court in permitting Moreau to testify. There we said: "While the question of the competency of witnesses is left largely to the discretion of the trial judge, there is no presumption that a witness is competent to give an opinion and his competency must be shown. It must appear that he has some peculiar means of forming an intelligent and correct judgment as to the value of the property in question, or the effect upon it of a particular improvement, beyond what is presumed to be possessed by men generally. To entitle a witness to testify to the value of a thing which is of such a nature as to have a current or market value he must be acquainted with the value of things of the class to which the thing whose value is in question belongs."

Moreau's testimony unquestionably showed that he was acquainted with the nature, location and value of lands best fitted for golf courses. Before being asked his opinion as to the market value of the tract in question he testified that he had been a golf architect and landscape engineer for eighteen years and had laid out about one hundred golf

courses in different States, from Florida to Michigan; that he had laid out fourteen or fifteen golf courses in Chicago and was experienced with reference to real estate acquired for such purposes, and that he had examined the Bedard land and with the help of an assistant had made a map thereof. All of the farmers who testified in this case did so from their knowledge of the value of lands for agricultural purposes. The real estate men who testified expressed their judgment of values for various purposes, chiefly concerned with its subdivision into lots or adaptability for a park or golf course. Since Moreau showed himself well qualified by years of experience in laying out and constructing golf courses the court did not abuse its discretion in allowing him to testify. The objection of appellant went to the weight of his testimony rather than to his competency to testify. It was not to be expected that Moreau would know the value of farm lands in that community any more than the farmers who testified for appellant would know very much concerning values of land favorably located for the establishment of a golf course. The jury had the benefit of this wide range of opinion of the different witnesses concerning the highest and best use of the land, and it is apparent that they used their own judgment in the matter, since from the verdict it appears that they followed neither the judgment of the golf architect, Moreau, nor the judgment of the farmers, in fixing their value of the 70-acre tract.

Appellant further insists that the testimony concerning the use of the Bedard land for a golf course was improper on the theory that land values cannot be proved by estimating the profits of a business to be conducted thereon. As a general proposition this is a correct statement of the law, since future or estimated profits from the conduct of any business are considered too remote and speculative to be a proper basis for fixing market values of land. The reason for this rule is that future profits depend to a large de-

gree upon proper management and many other contingencies which may or may not happen, (*Jacksonville and Southeastern Railway Co.* v. *Walsh, supra,*) but the application of this rule to the case at bar would have the effect of practically eliminating the testimony of two of appellant's witnesses—Allen, the golf professional, and McElhatten, the golf architect. Their testimony in rebuttal was almost entirely concerned with statements that because of excessive costs a daily fee golf course on the Bedard land would not be a profit-making venture. It is further significant that the direct testimony of Moreau, for the appellees, did not touch upon the question of future profits but that all such matters were brought out on his cross-examination by appellant. Certainly the appellant cannot be allowed to profit by objections to testimony concerning future profits or losses when the testimony complained of was first adduced by its own questions and then elaborated upon by its own witnesses on rebuttal.

It is further claimed by appellant that a demand for a particular use of land must be shown before it is competent for the court to receive evidence concerning the market value of such land for the particular use indicated. This court has frequently held otherwise. In *Calumet River Railway Co.* v. *Moore,* 124 Ill. 329, where the market value of lots along the river front was involved and the owner's efforts to show that their availability as dock property enhanced their market value, this court held such evidence was proper, saying: "It can make no difference that there might be no present demand for docks upon these lands. If in consequence of their supposed adaptation to such use they had an increased market value above what they otherwise would have, such value forms the proper basis of recovery." Likewise in *Pittsburg, Cincinnati, Chicago and St. Louis Railway Co.* v. *Gage,* 286 Ill. 213, we held: "The owner of land appropriated for a public use is entitled to its value for the most profitable use for which it is avail-

able, and a capacity for a future use which may be anticipated with reasonable certainty, though dependent upon circumstances which may possibly never occur, is competent to be shown and considered by the jury in fixing the compensation if the capacity for such use in fact enhances the market value of the land sought to be taken in its present condition and state of improvement." The same rule was recently applied by this court in *Forest Preserve District* v. *Dearlove,* 337 Ill. 555, where, in considering evidence of the market value of vacant lands being held for future subdivision purposes, this court held: "Even before subdivision in due course becomes an actuality there is a transition period in which such land may, by reason of its apparent approach, command a greater present value than for agricultural or other purposes. Whether this value may be termed speculative, or whatever may be its precise economic nature, it is for the time being existent." Without going further, we believe there was sufficient evidence in the record to amply sustain the verdict of the jury that the Bedard land was then well adapted for use as a golf course or for subdivision purposes, or for both of such uses jointly. The probability of some such future use enhanced the present market value of the land and justified the verdict finding that it was worth more than the prevailing price solely for agricultural purposes.

Complaint is also registered by appellant to instruction No. 6 given upon behalf of appellees, as follows:

"You are instructed that the defendant is entitled to the highest cash market value of the seventy (70) acres involved herein for the best and most valuable use to which it was adapted on June 8, 1928, provided such use affects its market value; that the highest cash market value is the price for which the owner, desirous of selling, but not being compelled to sell, would under ordinary circumstances surrounding the sale of property, and a person desirous of purchasing, but not being compelled to purchase, would have

paid for it on said date, and if it further appears from the evidence that on said date the property had any special value to the defendant from whatever cause growing out of the best use to which it was then adapted, such special value belongs to her and she is entitled to have you consider it in determining the amount of your verdict, although you may further believe that there was no existing demand on that date for such purpose or purposes for said lands."

The chief objection to this instruction is the use of the words "special value" therein, it being contended that it thus makes reference to some value apart from, or in addition to, the actual market value. However, a similar instruction with reference to the words "special value," and in almost the identical language of instruction No. 6, was given and approved by this court in *Ligare* v. *Chicago, Madison and Northern Railroad Co.* 166 Ill. 249. Likewise in *Sanitary District* v. *Loughran,* 160 Ill. 362, it was held: "It is not denied * * * that if it has a special value by reason of its being stone-producing land the owner is entitled to compensation according to its value as such." The instruction here in question is not susceptible of the double construction of market value plus special value claimed for it by appellant. The words "special value," as used in the instruction, undoubtedly referred to the best use for which the land was shown to be adapted on June 8, 1928. The evidence of various witnesses of both parties showed that the Bedard land had different elements of special value, such as river frontage, summer cottages, truck gardening, subdivision purposes, park and golf course. This varied testimony of special values fully warranted the giving of the instruction in question.

It is finally argued that the judgment of $500 per acre was manifestly excessive. This contention would be correct if it had been proper for the court to restrict the testimony to a consideration of values for farming purposes, only, but where the testimony of witnesses for appellant ranged from

$75 to $400 an acre for different parts of the tract for different uses, and where witnesses for appellees testified to values ranging from $800 to $1500 per acre, the verdict of $500 per acre is well within the range of the evidence. In fact, the award fixed by the jury in this case is much nearer the average value placed upon the land by appellant's witnesses than it is to the average value fixed by testimony for appellees. It is a well settled rule of this court that the damages awarded by a jury in a condemnation proceeding will not be disturbed where the evidence is conflicting, the jury views the premises and the amount of compensation fixed by it is within the range of the evidence. (*Jefferson Park District* v. *Sowinski,* 336 Ill. 390.) The appellees' witnesses differed as to whether its highest and best use was for golf, subdividing or other purposes, while appellant's witnesses thought its best uses were farming, summer cottages and truck gardening. The evidence was conflicting and the question was therefore properly left to the jury. (*River Park District* v. *Brand,* 327 Ill. 294; *Kankakee Park District* v. *Heidenreich, supra.*) The jurors saw the witnesses, heard their testimony and observed their demeanor. Nearly all of the witnesses on both sides were citizens who lived in or near the city of Kankakee, who swore they were acquainted with land values in that locality. Where there is a diversity of opinion and conflict of testimony, the value of the testimony of the different witnesses, based upon their opportunity for observation, their intelligence and experience, is a question for the jury. *Chicago and Evanston Railroad Co.* v. *Blake,* 116 Ill. 163.

The jury viewed the premises, and the compensation fixed does not appear excessive but was well within the range of the evidence. No reversible error is found in the record. Under these circumstances and the established rule of this court in condemnation cases the judgment must be affirmed.

*Judgment affirmed.*